UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

              Case No. 23-cr-20022
              Hon. GERSHWIN A. DRAIN

Vs.

MUSTAFA ABDUL KARIM HARES,

      Defendant

_____/

REGINA R. MCCULLOUGH
U.S. Attorney's Office
211 W. Fort Street; Suite 2001
Detroit, MI 48226
313-226-9618
Email: regina.mccullough@usdoj.gov

KENTON CRAIG WELKENER, JR
DOJ - EDMI - USAO
211 W. Fort St., Ste 2001
Detroit, MI 48226
313-226-0248
Email: kenton.welkener@usdoj.gov

PHILIP A. ROSS
U.S. Attorney's Office
211 W. Fort Street; Suite 2001
Detroit, MI 48226
313-226-9790
Email: philip.ross@usdoj.gov

1

SANFORD A. SCHULMAN
Attorney for Defendant:
    MUSTAFA ABDUL KARIM HARES
500 Griswold Street, Suite 2340
Detroit, Michigan 48226
(313) 963-4740
saschulman@comcast.net
_____/

## DEFENDANT, MUSTAFA ABDUL KARIM HARES' SENTENCING MEMORANDUM

## BACKGROUND AND PROCEDURAL HISTORY

Dr. Mustafa Abdul Karim Hares is a 79-year-old physician who will turn 80 years old this October. He has dedicated his career to serving his patients and his community. Dr. Hares has entered a plea of guilty in this matter and has accepted full responsibility for his conduct. Through this memorandum, the defense respectfully requests that this Court consider the totality of Dr. Hares' life, his character, and the unique and compelling circumstances that surrounded the offense in fashioning a sentence that is sufficient but not greater than necessary to accomplish the purposes of sentencing under 18 U.S.C. § 3553(a).

Dr. Hares is a man whose entire professional life has been devoted to healing others. He is a licensed physician who has spent years caring for patients, earning the respect and trust of those he has treated. He has no prior criminal history and has lived a law-abiding and productive life. The Presentence Investigation Report confirms that Dr. Hares has been a

2

contributing member of society, a devoted husband, and a respected professional in his field.

The circumstances that led to Dr. Hares' involvement in the instant offense are not those of a hardened criminal or someone motivated by greed. Rather, they reflect a man who was at one of the most vulnerable points in his life — caring for his terminally ill wife while simultaneously being exploited by a family member he trusted.

## ADVISORY SENTENCING GUIDELINES

Based upon a total offense level of 17 and a criminal history category of I, the advisory guideline imprisonment range is 24 months to 30 months. While the defense acknowledges the Court's obligation to correctly calculate the guideline range, this memorandum respectfully urges the Court to consider a non-custodial sentence in light of the extraordinary mitigating circumstances present in this case, including Dr. Hares' vulnerable state at the time of the offense, his advanced age, and his exemplary personal history.

**A. Nature and Circumstances of the Offense and Mitigating Factors**

While Dr. Hares accepts full responsibility for his actions, this Court should consider the extraordinary circumstances that contributed to the commission of the offense. Several compelling mitigating factors are present in this case that warrant a sentence at or below the low end of the advisory guideline range.

Dr. Hares was enrolled as a participating provider with Medicare and Medicaid through Centre. In that capacity, he participated in the conspiracy by approving reports and submissions prepared by therapists at the practice. It is true that Dr. Hares utilized the Kireo Electronic system to "approve" psychological progress notes and signed forms indicating that he agreed with the contents of those progress notes without first independently verifying that the patients identified in those notes had in fact received the services described. Dr. Hares does not minimize this conduct and accepts that his failure to verify the accuracy of the documentation before signing it was wrong.

However, this Court should consider the critical distinction between Dr. Hares' role and that of others involved in this scheme. It was not Dr. Hares who submitted the fraudulent claims and billing to Medicare. It was his brother-in-law, Kazkaz, who submitted claims and billing to Medicare

utilizing CPT codes for services that were never rendered. Kazkaz was the individual who managed the billing process, selected the CPT codes, and submitted the claims to the government for payment. Dr. Hares' role was limited to approving the progress notes — a role that, while culpable, is materially different from the individual who actively submitted false claims and directed the billing fraud.

This distinction matters for purposes of sentencing. Dr. Hares was not the architect of the fraud. He did not create the false billing codes, he did not submit the claims, and he did not control the financial aspects of the scheme. His culpability lies in his failure to exercise the oversight and diligence required of him as the enrolled provider — a failure that was significantly influenced by the extraordinary personal circumstances he was enduring at the time.

It is critically important for this Court to understand the limited nature of Dr. Hares's involvement in the overall scheme. Dr. Hares's National Provider Identifier ("NPI")—a unique 10-digit identification number assigned by the Centers for Medicare & Medicaid Services ("CMS") to every healthcare provider in the United States for purposes of billing and provider identification—was never used in connection with the submission of any claims for Medicare reimbursement. Dr. Hares had no involvement

5

whatsoever in the billing process, and his NPI number was not utilized to submit claims or to receive payment from Medicare or any other payer.

Dr. Hares played no role in the preparation, review, or submission of any billing to Medicare. He did not prepare, complete, or submit any CMS-1500 claim forms—the standard form used by healthcare professionals to bill Medicare for professional services—nor did he prepare, complete, or submit any UB-04 claim forms, which are used for institutional billing purposes. Dr. Hares did not direct, authorize, or instruct anyone to use his name or credentials on any billing forms submitted to Medicare. The entirety of the claims submission process was handled by co-defendant Kazkaz and others, without Dr. Hares's direct participation or knowledge of the specific billing activities.

While Dr. Hares acknowledges that he approved the Psych Progress Notes through the Kareo electronic submission system, it is important for this Court to understand the context in which those approvals occurred. Dr. Hares was presented with progress notes that were already completely filled out with what appeared to be accurate and legitimate clinical information. Each note had been signed by a licensed therapist and, on its face, appeared to reflect the provision of genuine therapeutic services to actual patients. The notes did not contain obvious errors, inconsistencies,

6

or red flags that would have immediately alerted a reasonable person to the fraudulent nature of the underlying claims. Dr. Hares has accepted full responsibility for his failure to conduct an independent verification of the information contained in those progress notes before affixing his electronic signature as the co-signing provider.

Finally, it is significant that Dr. Hares was never contacted—directly or indirectly—by anyone at or affiliated with the Centers for Medicare & Medicaid Services, any Medicare Administrative Contractor, or any other governmental agency regarding any issue involving the billing at issue in this case. Dr. Hares received no email, no telephone call, no letter, no audit notice, and no communication of any kind from CMS or any related entity raising concerns about the claims that were being submitted. Had Dr. Hares received any such inquiry or notification, he would have had the opportunity to investigate and take corrective action. The absence of any such contact further underscores that Dr. Hares was not a knowing participant in the billing fraud, but rather was deliberately indifferent to the actions of his co-defendant.

Moreover, the Court should consider the limited financial benefit Dr. Hares received from this arrangement. Dr. Hares' brother-in-law, Kazkaz, offered to loan Dr. Hares $600,000 to assist with Dr. Hares' tax liability.

This loan was the entirety of what Dr. Hares received in connection with this scheme. Dr. Hares did not receive ongoing payments, profit-sharing, or lavish personal enrichment from the fraudulent billing. The $600,000 loan from Kazkaz was directed toward Dr. Hares' existing tax obligation — not toward the acquisition of luxury goods or an extravagant lifestyle. This further underscores that Dr. Hares was not motivated by greed, but rather was a vulnerable individual whose financial pressures were exploited by a family member who stood to gain far more from the fraudulent scheme.

### 1. Dr. Hares' Age

Dr. Hares is 79 years old and will turn 80 this October. Research consistently demonstrates that age is one of the strongest predictors of reduced recidivism. The United States Sentencing Commission has recognized that older defendants pose significantly lower risks of reoffending. At nearly 80 years of age, Dr. Hares presents virtually no risk of recidivism. The empirical data on age and criminal behavior is unequivocal: defendants of Dr. Hares' age reoffend at rates that are a fraction of those seen in younger populations. A lengthy custodial sentence for a man approaching his eighth decade of life is neither necessary for public protection nor appropriate given the goals of sentencing. Furthermore, the Bureau of Prisons' costs of incarcerating elderly inmates

are substantially higher due to increased medical needs, and these costs must be weighed against the marginal benefit to public safety, which in Dr. Hares' case is negligible.

### 2. His Wife's Terminal Illness

At the time of the events giving rise to the offense, Dr. Hares' wife was suffering from a terminal illness. As both a physician and a devoted husband, Dr. Hares was consumed with caring for his wife during the most difficult period of their lives together. The emotional and physical toll of watching a spouse deteriorate from a terminal illness cannot be overstated. Dr. Hares was simultaneously trying to manage her medical care, provide emotional support, and maintain some semblance of normalcy in their household — all while processing the inevitable loss he was facing.

This overwhelming personal crisis significantly impaired Dr. Hares' judgment and his ability to attend to matters outside of his wife's care with the diligence and attention he would have otherwise exercised. His focus was, understandably and appropriately, directed toward his dying wife. It was during this period of profound personal distress that Dr. Hares failed to independently verify the accuracy of the progress notes he was approving through the Kireo system. The stress, grief, and exhaustion associated with serving as a caregiver for a terminally ill loved one are well-documented to

9

affect cognitive functioning, decision-making, and vulnerability to outside influences. This Court should consider the profound impact that this personal tragedy had on Dr. Hares' state of mind and his ability to fulfill his professional oversight responsibilities during the relevant period.

### 3. Exploitation by His Brother-in-Law, Kazkaz

Perhaps most significantly, Dr. Hares was exploited by his own brother-in-law, Kazkaz, a family member who was fully aware of Dr. Hares' vulnerable state. Kazkaz knew that Dr. Hares was emotionally and physically depleted from caring for his terminally ill wife. He knew that Dr. Hares was distracted, overwhelmed, and not exercising the same level of scrutiny and judgment he would have under normal circumstances. Rather than supporting Dr. Hares during this crisis, Kazkaz took advantage of the situation for his own benefit by managing and submitting the fraudulent billing to Medicare using CPT codes for services that were never rendered.

Kazkaz further cemented his exploitation by offering Dr. Hares a $600,000 loan to address Dr. Hares' tax liability. This financial entanglement deepened Dr. Hares' dependence on Kazkaz and made it even more difficult for Dr. Hares to question or challenge the billing practices being conducted under his provider number. Kazkaz understood

10

that by creating this financial obligation, he was binding Dr. Hares more tightly to the arrangement.

The fact that the exploitation came from within Dr. Hares' own family — from someone he trusted implicitly during his most vulnerable moment — is a significant mitigating factor. Dr. Hares did not seek out criminal activity. He did not devise the billing fraud. He did not submit the false claims. He was targeted by someone who recognized and exploited his weakened emotional state, someone who knew that Dr. Hares was too consumed with his wife's care to scrutinize the paperwork being placed before him. Courts have long recognized that defendants who are manipulated or exploited by others, particularly by those in positions of trust, warrant more lenient treatment at sentencing. See United States v. Manzella, 475 F.3d 152, 161 (3d Cir. 2007) (recognizing vulnerability to manipulation as a mitigating factor).

## B. Defendant's Characteristics

The Presentence Investigation Report reflects that Dr. Hares is a man of considerable personal and professional accomplishment. He is a licensed physician who has devoted his career to the practice of medicine and to the care of his patients. His professional achievements are a testament to his intelligence, work ethic, and commitment to serving others.

11

Dr. Hares has no prior criminal history. He has lived his entire adult life — nearly eight decades — as a productive, law-abiding citizen. He has been a dedicated husband who stood by his wife through her terminal illness, a caring family member, and a respected member of his community. The Presentence Investigation Report confirms that Dr. Hares has strong family ties and a robust support system that will aid in his continued rehabilitation.

Dr. Hares' educational achievements are noteworthy. Obtaining a medical degree and maintaining a medical practice requires years of rigorous study, discipline, and dedication. These qualities reflect a man who has the capacity and the commitment to lead a productive and law-abiding life. His medical career demonstrates that he has spent his professional life in service to others, and his skills and training represent a valuable contribution to society that would be diminished by an unnecessarily lengthy period of incarceration.

### C. Legal Framework

While this Court must correctly calculate the guideline range, *Gall v. United States*, 552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, *id.* at 51; *Nelson v. United States*, 555 U.S. 350, 352 (2009), but must treat it as "one factor among several" to be

considered in imposing an appropriate sentence under § 3553(a).

*Kimbrough v. United States*, 552 U.S. 85, 90 (2007). The Court must

"consider all of the § 3553(a) factors," "make an individualized assessment

based on the facts presented," *id.* at 49–50, and explain how the facts

relate to the purposes of sentencing. *Id.* at 53–60; *Pepper v. United States*,

562 U.S. 476, 488–90 (2011). The Court's "overarching" duty is to "impose

a sentence sufficient, but not greater than necessary" to accomplish the

goals of sentencing. *Id.* at 101.

It is the full and unfettered power of this Court to impose a sentence

that is fair and reasonable. The guidelines are a computational calculation

that does not adequately consider many relevant factors such as

rehabilitation, personal circumstances, health challenges, role in and

circumstances of the offense, employment history, and contributions to the

community. This Court should exercise its discretion to fashion a sentence

that reflects not just the offense, but the totality of who Dr. Hares is as a

person.

13

## D. Need for Adequate Deterrence, 18 U.S.C. § 3553(a)(2)(B)

Dr. Hares has been profoundly affected by these proceedings. The personal and professional consequences he has already endured — the damage to his reputation, the potential impact on his medical license, the strain on his family relationships, and the public nature of these proceedings — have already served as powerful deterrents. For a man who has spent his entire career building a respectable medical practice and serving his community, the collateral consequences of this conviction are severe and lasting.

The empirical evidence is clear that there is no meaningful relationship between sentence length and general or specific deterrence. *See* Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that correlations between sentence severity and crime rates were not sufficient to achieve statistical significance). Dr. Hares has been not just deterred but fundamentally redirected by this experience. Given his age of nearly 80 years, his professional standing, his lack of prior criminal history, and the extraordinary personal circumstances that contributed to the offense, the likelihood of recidivism is exceptionally low.

14

## E. Need for Incapacitation, 18 U.S.C. § 3553(a)(2)(C)

The Sentencing Commission's research demonstrates that employment, education, and family ties and responsibilities all predict reduced recidivism. Dr. Hares possesses all of these protective factors. He is a highly educated physician with strong family ties and a demonstrated commitment to productive employment. His full and complete acceptance of responsibility, combined with the absence of any prior criminal conduct over nearly 80 years of life, demonstrates that Dr. Hares does not pose a risk to the community and that a sentence of incarceration beyond what is necessary to reflect the seriousness of the offense would serve no legitimate penological purpose.

A sentence that is sufficient but not greater than necessary should take into consideration that Dr. Hares is an elderly professional with no history of violence, no prior criminal record, and significant ties to his community. The factors that contributed to the offense — his wife's terminal illness, his emotional vulnerability, and the exploitation by his brother-in-law Kazkaz — were situational and are unlikely to recur.

15

### F. Letters in Support

Attached hereto are various letters from family members, colleagues, patients, and other members of the community, as well as a personal letter from Dr. Hares himself. These letters provide this Court with insight into Dr. Hares' character, his contributions to his profession and community, and how he is viewed by those who truly know him. Dr. Hares' personal letter is sincere and describes how this case has profoundly affected him and his commitment to demonstrating through his future conduct that he has learned from this experience.

### CONCLUSION AND SENTENCING RECOMMENDATION

The advisory sentencing guidelines, based upon a total offense level of 17 and a criminal history category of I, produce a guideline imprisonment range of 24 months to 30 months. However, the defense respectfully requests that this Court consider imposing a non-custodial sentence given the unique facts of this case. The extraordinary combination of Dr. Hares' vulnerable state at the time of the offense, his advanced age of nearly 80 years, his exemplary personal history spanning nearly eight decades without any criminal conduct, and the compelling mitigating circumstances detailed herein justify a departure from the guideline range. A non-custodial

16

sentence would be sufficient but not greater than necessary to accomplish the 18 U.S.C. § 3553(a) factors.

This Court should consider that Dr. Hares is nearly 80 years old, that he has no prior criminal history over the course of his entire life, that he dedicated his career as a physician to caring for others, that he has fully accepted responsibility, that he has strong family support, and that the extraordinary personal circumstances — including his wife's terminal illness and his exploitation by his brother-in-law Kazkaz — contributed to the offense.

The Court should further consider that Dr. Hares' role in the conspiracy, while culpable, was materially different from that of Kazkaz. Dr. Hares approved progress notes and signed forms without independently verifying the services. It was Kazkaz who submitted the false claims and billing to Medicare using CPT codes for services never rendered. Dr. Hares was not the architect of this fraud; he was a participant whose involvement was facilitated by his vulnerability and his misplaced trust in a family member. The entirety of what Dr. Hares received was a $600,000 loan from Kazkaz to address his tax liability — not the proceeds of lavish personal enrichment.

Dr. Hares is not a man who chose a life of crime. He is a physician who, during the darkest period of his life, was taken advantage of by someone he trusted. He has accepted responsibility, he has been profoundly affected by these proceedings, and he is committed to demonstrating through his future conduct that this chapter of his life was an aberration, not a reflection of who he is. A non-custodial sentence that reflects these realities — one that balances the seriousness of the offense with the totality of Dr. Hares' life, his vulnerable state at the time of the offense, his advanced age, and his exemplary personal history — would be consistent with the factors of § 3553(a), including punishment, deterrence, and rehabilitation, and would allow Dr. Hares the opportunity to continue serving his family and his community. The defense submits that a non-custodial sentence, which may include probation, home confinement, community service, or a combination thereof, is the most appropriate disposition given the unique and compelling circumstances of this case.

Respectfully submitted,

/s/ Sanford A. Schulman
SANFORD A. SCHULMAN
Attorney for Defendant:
    MUSTAFA ABDUL KARIM HARES
500 Griswold Street, Suite 2340
Detroit, Michigan 48226
(313) 963-4740
Date:  April 5, 2026     Email: saschulman@comcast.net

18